See also, 649 F.Supp. 1169.

Roberto **RODRIGUEZ**, et al.,
Plaintiffs, Appellees,

v.

Mario **MONTALVO**, et al.,
Defendants, Appellees.

Appeal of Waldemar V. **RODRIGUEZ–SANTIAGO**, Third–Party
Defendant, Appellant.

Roberto **RODRIGUEZ**, et al.,
Plaintiffs, Appellants,

v.

Mario **MONTALVO**, et al.,
Defendants, Appellees.

Nos. 88–1102, 88–1103.

United States Court of Appeals,
First Circuit.

Heard Feb. 10, 1989.
Decided March 22, 1989.

Jorge Galva Rodriguez with whom Federico Ramirez Ros and Ramirez, Latimer & Biaggi, San Juan, P.R., were on brief, for plaintiffs, appellants.

A.J. Amadeo Murga with whom Amadeo & Oronoz Law Offices, Hato Rey, P.R., was on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, and BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The basic issue in this case concerns the value of plaintiffs' 65 percent share in Cadierno Corporation, a grocery and liquor distribution business. Plaintiffs sold their shares to defendant Montalvo (who owned the remaining 35 percent share) in 1982. At that time they thought their shares were nearly worthless. After the sale the business prospered. The plaintiffs then began to think that the defendant had deceived them about the value of their shares. The plaintiffs sued, claiming fraud in violation of the Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b) (1982); Rule 10b–5, 17 C.F.R. § 240.10b–5 (1987), and related Puerto Rico statutes. The jury found for the defendant, and the plaintiffs appeal.

Plaintiffs point out that one of their number, Roberto Rodriguez Santiago, was a minor at the time of the sale. They point to a Puerto Rico statute that says a parent must get judicial permission to sell a minor child's assets worth more than $2,000. Civil Code of Puerto Rico, Sec. 159, 31 L.P.R.A. § 616 (Supp.1987). They note that Roberto's parents did not obtain judicial permission to sell his shares. This fact, they believe, voids the sale of Roberto's shares.

Appellants concede that the jury specifically found that Roberto's shares did not have "a value exceeding $2,000" in 1982, and further, that the jury answered "no" when asked whether the value of the shares "approximates $2,000 but still was doubtful" in 1982. But, they go on to claim that (1) Sec. 159 applies whenever there is some doubt that the property's value does not exceed $2,000; and (2) no reasonable jury could have found that there was no doubt that Roberto's shares were worth less than $2,000 in 1982.

■ In our view, the appellants are wrong on both points. Appellants' claim that Sec. 159 applies whenever there is doubt about the property's value rests upon *Cruz v. Central Pasto Viejo, Inc.,* 44

P.R.R. 354, 365–66 (1933), in which the Supreme Court of Puerto Rico said that, in a case where "it is not an easy undertaking to determine" the value of the asset, judicial authorization is required. *See also In re Rivera,* 86 P.R.R. 87, 97 (1962). But, in the more recent case of *Ferre v. Registrar,* 109 P.R.R. 188, 193 (1979), the court said:

The requirement imposed by art. 159 of the Civil Code on the parent—he must ask for judicial permission to alienate or encumber his children's property—should be strictly, not liberally construed.... The limitations on the father's power to dispose of the property of minor children under his custody should not extend beyond what is expressly provided by law for, as a rule, there is no better guardian of the interests of his children than their father.

The court in *Ferre,* however, did not expressly overrule *Cruz.* Moreover, earlier Puerto Rico cases have held that decisions in administrative appeals from actions taken by the registrar of property (such as *Ferre* ) are binding only on the parties before the court. *Succession of Criado v. Martinez,* 25 P.R.R. 308, 313 (1917) (a decision "rendered in an administrative appeal" "does not establish jurisprudence"); *see also Jimenez v. Alvarez,* 69 P.R.R. 299, 308 (1948) (decision in administrative appeal "could in no way prejudice" a non-party who, according to the registry of property, had rights inconsistent with the plaintiff's claim). Nonetheless, *Ferre* offers guidance as to the Puerto Rico Supreme Court's current view of Sec. 159. The context of the *Ferre* decision—that of a commercial transaction—is similar to this case. The context of *Cruz* and *Rivera* is not similar. (Both cases involved parents pressured to settle a minor child's personal injury tort claim.) Moreover, Sec. 159 imposes complex sale procedures, including a public auction, upon assets that fall within its scope, *see* Code of Civil Procedure, Sec. 616, 32 L.P.R.A. § 2723 (Supp.1987), a fact suggesting that applying it to assets of small value will often work against a minor's best interests. For these reasons, we believe the Supreme Court of Puerto Rico

would construe Sec. 159 in this case, as it did in *Ferre,* to apply only when the minor's assets are likely worth more than $2,000, not whenever there is some doubt about their worth.

■ Regardless, the record contains sufficient evidence for a reasonable jury to conclude that, in 1982, the value of Roberto's shares, without doubt, did not exceed $2,000. (Since Roberto owned one-fourth of plaintiffs' 65 percent share, or 16.25 percent, this means that the jury must have concluded that the value of the entire corporation did not exceed $12,300.)

Of course, plaintiffs presented considerable evidence that the shares had value. They pointed out: that Cadierno was a large firm with gross sales of $1.2 million in 1978, growing to $3.4 million by 1981; that Cadierno had the right to distribute a new and successful product, the sugar substitute "Equal"; and that defendant Montalvo had projections prepared which predicted before-tax profits of $136,000 in 1982, rising to $368,000 in 1986. Moreover, plaintiffs' expert witness estimated that Cadierno was worth 1.5 million in mid–1982 (by assuming that each of its distribution rights was worth 1.5 times the "gross profits" from sales of that product, and then subtracting the corporation's debts).

The defendant, however, pointed out: that plaintiffs' grandfather paid only $25,000 for Cadierno in 1978; that it incurred a string of net losses ($7,000 in 1979, $28,000 in 1980, $112,000 in 1981); that its historical-cost-based balance sheet showed a negative book value of $717,000 in 1981 (increasing from $341,000 in 1978); and that it had a debt of about $1.3 million in 1981, which debt it reduced to about $400,000 in 1982, by selling the right to distribute "Dry Sack" sherry. Defendant's expert testified that the several methods he used to value the company all pointed to a "negative value." He also said that it was "very, very hard to attribute value" to Cadierno.

We have examined this and other evidence in the record, in light of *Insurance Co. of North America v. Musa,* 785 F.2d 370 (1st Cir.1986), where we wrote:

Ultimately, we must uphold the jury's verdict unless the evidence and accompanying inferences "point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have arrived at [the] conclusion" actually reached. *Chedd–Angier Production Co. v. Omni Publications International, Ltd.,* 756 F.2d 930, 934 (1st Cir.1985).... Where the jury's factual conclusion itself takes the form "The plaintiff failed to prove ...," it is particularly difficult for a court to say the jury was wrong; thus, we are especially reluctant to require a directed verdict or the entry of judgment n.o.v. in favor of a party with the burden of persuasion.

*Id.* at 372 (citations omitted). We conclude that the plaintiffs here failed to meet this exacting standard. The evidence in the record does not show them to be entitled to a directed verdict on the question.

■ Appellants also argue that the court should not have admitted into evidence the testimony of Monsignor Jaime Capo, a Catholic priest. Monsignor Capo, Montalvo's spiritual advisor, testified that: (1) in late 1981, Montalvo told him he was worried because "the business in which he had entered was about to end" and "the partners ... had entrusted him with the liquidation.... they did not want to risk any more losses and he also had to lose everything;" (2) about a month later, Montalvo expressed hope that the sale of some distribution rights would release him from "certain economic pressures;" and (3) in early 1982, Montalvo told him that a problem had arisen with this sale, and "he would be unable to save the situation."

Appellants argue that the testimony was not relevant. But, though somewhat self-serving, the testimony does tend to show that Montalvo lacked the "fraudulent intent" necessary for liability under Rule 10b–5. *See S.E.C. v. MacDonald,* 699 F.2d 47, 50–51 (1st Cir.1983) (defendant's state of mind during time period of negotiations is relevant to a Rule 10b–5 claim). Appellants also claim this evidence was prejudicial, and designed simply to bolster Montalvo's credibility before the jury by associ-

ating him with a prestigious figure such as Monsignor Capo. The power to weigh probative value against possible prejudice, under Fed.R.Evid. 403, however, belongs primarily to the district court. *See United States v. Long,* 706 F.2d 1044, 1054 (9th Cir.1983) (trial judge has wide discretion in determining whether probative value of evidence outweighs danger of prejudice). And, we have found nothing in the record that shows that the balance the court struck, in favor of admissibility, exceeded its lawful powers.

The judgment of the district court is

*Affirmed.*